Candy v. Globe Rubber Co.

---

JOHN B. CANDY

*v.*

THE GLOBE RUBBER COMPANY.

1. A sale of chattels to a corporation may be rescinded where credit therefor was given to the corporation on the strength of cotemporaneous representations of the officers as to its solvency and prosperity, which representations are shown to have been false and fraudulent when made.

2. Where the treasurer of a corporation pays for some of its capital stock, bought and claimed by him individually, out of the funds of the corporation,

and also endorses the notes of a customer, for his accommodation, in the name of the corporation, *bona fide* sales made thereafter to the corporation may be rescinded, and the goods reclaimed.

On petitions filed by G. K. Sheridan, Brinkerhoff, Turner & Co., William R. Grace & Co., and H. B. Claflin & Co., to rescind certain contracts of sale made by the several petitioners to the said rubber company.

*Mr. A. G. Richey,* for G. K. Sheridan.

*Mr. S. M. Dickinson,* for Brinkerhoff & Co.

*Mr. R. S. Woodruff* and *Mr. J. Buchanan* for William R. Grace & Co.

*Mr. Franklin M. Olds.* for H. B. Claflin & Co.

BIRD, V. C.

The Globe Rubber Company was organized by filing the certificate required by the statute, April 15th, 1881, with a capital stock of three hundred shares, each of the value of $100. In July the books were opened, and before the expiration of six months thereafter the stock was all taken by John B. Candy, James F. Brook, Charles S. Knowles and Josiah Hollis. Candy was elected treasurer, Brook, president, Hollis, secretary. Soon after the books were opened and the officers elected, the company commenced the purchase of goods and the manufacture and sale of rubber.

On the 8th day of November, 1882, John B. Candy filed his bill in this court declaring that he was the owner of two hundred and ninety-eight shares of said stock, and that Brook and Hollis were each the owner of one share; that the corporation owned real estate of the value of $80,000; that it was in active operation until November 6th, 1882, when, being insolvent, it suspended; that said company sold goods largely to one Wm. A. Leavitt, of Philadelphia, in payment of which it accepted a

large amount of his paper, and that it loaned to him its paper for his accommodation, and endorsed his paper for his benefit, in the belief that he was responsible; and that it is largely indebted to parties for material purchased, to be used in the manufacture of rubber, and to mechanics and others; and that said Leavitt became unable to pay the notes it had loaned to him.

An injunction was allowed and a receiver appointed, who took upon himself the administration of the assets of the company. Soon after the said petitioners filed their respective petitions, stating that they had made sales to the said company just prior to its failure, on the belief created by representations of the said company that it was solvent, and asking that said contracts be rescinded and that the goods still on hand be returned. That vendors have the right of rescission when imposed upon through fraud, has long been established. Are the petitioners within the rule? I will first inquire whether or not there was any misrepresentation or concealment, amounting to fraud, in the contract of purchase, whether made at the time of sale or within such reasonable time as to influence the mind or action of a prudent man.

In behalf of Brinkerhoff, Turner & Co., their agent called on John B. Candy, at the office of the company, about the middle of October last, for the purpose of selling him goods, and in the course of conversation inquired of him how they were doing, and was told that they were getting along nicely and finely, and were sold ahead of orders. The witness says that Mr. Candy's manner was such that he inferred there was no question about anything connected with the Globe Rubber Company, and that he felt sure it was in good condition. He also says that during the purchase of a lot of these goods Mr. Brook came in, and that he asked him, "How are things with you—how are you getting along?" when Mr. Brook replied, "We are selling ahead of orders." This was after the interview with Candy, and several months after Brook had sold all his stock to Candy, although he still was acting as president of the company and soliciting orders for its wares.

John O. Rourke, the book-keeper of Mr. Sheridan, says that he

12

had an interview with Mr. Candy at the office of the company about the latter part of March or 1st of April, 1882, as to the responsibility of the company. He learned that the company had a paid-up capital of $30,000; that it had given a mortgage of $10,000; that the accounts due and bills receivable were sufficient to pay said mortgage; that they were perfectly solvent, and in as good or better shape than any other company in Trenton; and that they were backed by C. S. Knowles, who let them have money when they needed it. The witness says he told this to Mr. Sheridan, and that goods were sold on the strength of these assertions.

William P. Earle, who made the sale for William R. Grace & Co., says that he had a conversation with Mr. Brook just prior to a shipment of a lot of goods now claimed by William R. Grace & Co., and that as Brook came in he (Earle) said: "How are you getting along?" to which Brook replied: "All right." He also says he made frequent inquiries of Brook during the year as to their standing. He says Brook told him they were making money; that their notes sold from eight to ten per cent., which, he said, gave them confidence. But it is quite significant that Earle Brothers learned something of the insecurity of this company's paper as early as June, and refused to trust it until it procured an endorser. After this they extended no favors without an endorser.

H. B. Claflin & Co. make no effort to establish fraud at any of the sales made by them.

I think Brinkerhoff, Turner & Co. had a right to rely on the response of Mr. Brook to the inquiry, "How are things with you—how are you getting along?" when he said, "We are selling ahead of orders." The assurances of Candy to the agent of Sheridan were such as to create confidence, but were made so long before the failure as to render it quite doubtful whether the court would be justified, on that ground alone, in sustaining the effort to rescind the contract of sale made in October. I do not think such representations ought to be relied upon for an indefinite period of time. As to the contract of purchase of William R. Grace & Co., I think the testimony of Earle shows that

he did not rely for payment on anything said by Brook, but trusted the endorser wholly. The rescission depending on the question of fraud in the contract of sale as to the solvency of the vendee, the fraud should be very clearly established when part of the contract is that the vendee shall pay by note endorsed by a third person, of whose ability the vendor became satisfied by inquiries, as was done in this case, besides the particular inquiry spoken of by William P. Earle, " How are you getting along ? " to which Brook replied, " All right." If Brook understood it as referring to business, rather than to his health, it can scarcely be regarded as anything more than simple commendation.

But the inquiry in this case is not limited by the narrow boundaries of the contract of sale. From the time in June, when Candy became the real owner of all the stock (Brook and Hollis each holding in his own name one share, that the law might be complied with, and each of them have an office), every act was a fraud and every contract rescindable at the option of the deceived vendor. Whatever may have been intended by these corporators, such gross abuse of the generous aid intended by the legislative sanction deserves the prompt condemnation of every tribunal before which the question is raised. After this exhibition of the mischievous uses to which a most beneficial act can be applied, if the courts were to pass it by in silence, it would certainly behoove the first legislature to repeal the law. A single sentence will show how an honest trading community may be deceived by the devices of the skillful. Brook sold his hundred shares of stock to Candy for $10,000, retaining as collateral the possession of all that had not been hypothecated in his own private affairs, which stock Candy paid for at different periods of time between June and November out of the money and other assets of the company. And as if this were not enough, Candy further abused the position he obtained under the forms of law by endorsing the accommodation paper of Leavitt to the extent of from $40,000 to $60,000 per month, with the name of the Globe Rubber Company.

These alone are sufficient grounds for every one of the peti-

tioners to stand upon. I shall advise an order rescinding these contracts of sale to the extent that the articles can be identified, but without costs to the receiver.